**VOEST–ALPINE TRADING USA CORPORATION**

v.

**VANTAGE STEEL CORPORATION, Cypress International Corporation, Paige Steel, Inc., Paige Industries, Inc., Paige Steel Processing, Inc., Marvin F. Stabler, and Holley Sue Stabler.**

Civ. A. No. 87–3320.

United States District Court, E.D. Pennsylvania.

Nov. 14, 1989.

Stewart Dalzell, Mary Kohart, Paul Mc-Donald, Philadelphia, Pa., for plaintiff.

Patrick Kittredge, Gardinia Brooma, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

FULLAM, Chief Judge.

Plaintiff brought this suit claiming that defendants violated the Uniform Fraudulent Conveyance Act, as adopted in Pennsylvania at 39 Pa.S. §§ 351–363, and the Uniform Commercial Code—Bulk Transfers, as adopted in Pennsylvania at 13 Pa. C.S. §§ 6101–6111. The disputed assets were located in both Pennsylvania and New Jersey, but the two states' laws are substantially identical. As a matter of convenience, Pennsylvania law will be cited in this Memorandum. This court has jurisdiction pursuant to 28 U.S.C. § 1332(a), since the parties are citizens of different states, and the amount involved exceeds the jurisdictional threshold.

After a non-jury trial, I now record the following findings of fact:

### FINDINGS OF FACT

*The Parties*

1. Plaintiff Voest–Alpine Trading USA Corporation (VATCO) is a New York corporation, with its principal place of business in Stamford, Connecticut.

2. VATCO is a judgment creditor of defendant Paige Steel, Inc.

3. Defendant Vantage Steel Corporation (Vantage) is a Pennsylvania corporation, with its principal place of business in Newtown, Pennsylvania.

4. Defendants Cypress International Corporation (Cypress), Paige Steel, Inc. (Paige Steel), and Paige Steel Processing Corp. (PSP) are corporations organized and existing under the laws of the Commonwealth of Pennsylvania. Prior to August 11, 1986, these companies maintained their principal places of business in Pennsylvania.

5. Paige Industries, Inc. (Paige Industries) is a corporation organized and existing under the laws of New Jersey.

6. Defendants PSP and Paige Steel are wholly-owned subsidiaries of defendant Paige Industries. Paige Industries is a wholly-owned subsidiary of defendant Cypress. All of these entities will be referred to collectively as "the Paige Group".

7. At all relevant times defendant Marvin F. Stabler, a citizen of Pennsylvania, owned one hundred percent (100%) of Cypress's common stock and thereby controlled all of the defendant corporations comprising the Paige Group.

8. Defendant Holley Sue Stabler is a citizen of Pennsylvania and is married to Marvin Stabler.

*Events Leading Up To The August 8, 1986 Transactions*

9. In October, 1984, the Paige Group and the New Jersey National Bank (NJNB) executed a Loan and Security Agreement providing the Paige Group with a $3.5 million revolving-credit loan and a term loan of $500,000 (the Paige loan). (Plaintiff's Exhibit 209)

10. The Paige Group's debt to NJNB was secured by the assets of the Paige Group and (1) the unconditional and coterminous personal guaranty of the Stablers, (2) a mortgage on rental property owned by

the Stablers, and (3) an $80,000 certificate of deposit owned by the Stablers.

11. In August 1985, VATCO sold a quantity of steel to Paige Steel for $528,-727.34. Paige Steel paid $100,000 on account. When VATCO did not receive the balance of the payment, it filed suit in this court. This case was captioned *VATCO v. Paige Steel, Inc.*, Civil Action No. 85–7264, (*Paige I*). (Plaintiff's Exhibit 188)

12. A NJNB memorandum shows that Paige Steel had "no defense" to the *Paige I* litigation and it was a source of concern to NJNB and the Paige Group. (Exhibit 8)

13. During the spring and summer of 1986, the Paige Group had been negotiating with NJNB trying to work out a way for the Paige Group to pay down approximately $1.5 million in debt to the NJNB. These negotiations included discussions of how to handle the *Paige I* litigation, whether Marvin Stabler should place the Paige Group into Chapter 11 reorganization, and whether he could find a buyer for the Paige Group's assets. (Plaintiff's Exhibit 8; Testimony of Scharmett 178, 192–97)

14. In the summer of 1986, VATCO was the Paige Group's largest unsecured creditor. Paige Steel's obligation to VATCO represented approximately 50% of its unsecured debt. (Plaintiff's Exhibit 215, p. 2995; Testimony of Marvin Stabler 30–32)

15. Under 11 U.S.C. § 1103, VATCO would have had a significant voice in the unsecured creditors' group in any Chapter 11 proceedings. This legal reality was unacceptable to Marvin Stabler because of his concern that VATCO, as a condition of its willingness to approve any reorganization plan, would have insisted that NJNB obtain payment of its secured debt, in part, by exercising its rights under the Stablers' personal guaranty. In any event, the idea of placing the Paige Group into bankruptcy under Chapter 11 was eventually rejected. (Testimony of Scharmett, 195–97)

16. On June 12, 1986, VATCO moved for summary judgment in *Paige I.* (Plaintiff's Exhibit 217)

17. The next day, Marvin Stabler, Gary Scharmett (the attorney who represented the Paige Group in business matters), William Jacobs (the Paige Group's loan officer at NJNB), and other individuals met at NJNB. Marvin Stabler and Scharmett told NJNB that VATCO had "no defense" to the *Paige I* litigation. Marvin Stabler and Scharmett asked NJNB to fund an advertisement in the *Wall Street Journal* for the sale of the Paige Group, and NJNB agreed to do so. (Plaintiff's Exhibit 8)

18. The advertisement, which appeared on June 18, 19, and 20, in the *Wall Street Journal* stated:

### ACQUISITION OPPORTUNITY

Steel dist/processing business in Phila. PA area. 1985 sales $6 mil. NOL $1.7 mil. Inv. at cost $1.4 mil. Equip. at market $750K +. Good leveragability. Excellent turnaround opportunity. Price $1,725,000.

    Contact Gary Scharmett,
    1100 One Franklin Plaza,
    Phila. Pa. 19102
    (215)563–8046

(Plaintiff's Exhibit 238)

19. In July 1986, in response to this advertisement, Richard Steinberg began negotiating for the purchase of the Paige Group's assets with Marvin Stabler and Scharmett. (Testimony of Steinberg, 220–28, 235)

20. Early in the week of July 28, 1986, Marvin Stabler and Scharmett made a proposal to NJNB that Marvin Stabler form a new company which would, with the help of a NJNB loan, purchase the assets of Paige Steel and the other companies in the Paige Group. The purchase would be accomplished through a "foreclosure" by NJNB in order to launder the assets and cleanse the Paige Group of its unsecured debt. (Plaintiff's Exhibit 3,; Testimony of Steinberg, 229–30)

21. Further meetings were held on July 31 and August 4, 1986 between Marvin Stabler, Scharmett, and representatives of NJNB to discuss these transactions. (Plaintiff's Exhibit 3)

22. Steinberg did not attend these meetings. Although Steinberg maintains that

Scharmett was not "representing" him in an official capacity, Steinberg testified that he gave Scharmett instructions to negotiate for the smallest possible purchase price. (Testimony of Steinberg, 116–17, 126, and 227) At trial, Marvin Stabler testified that even though Scharmett was representing Paige Steel and seeking the highest possible price for assets, Steinberg presented his proposals through Scharmett. (Testimony of Marvin Stabler, 46–47) In his own testimony, Scharmett stated that he represented Paige Steel, the Stablers, *and* Vantage at the crucial August 8, 1986 meeting. (Testimony of Steinberg, 161–63)

23. In August 1986, the Stablers' personal assets were significantly less than the amount of the Paige loan which the Stablers had personally guaranteed. (Testimony of Marvin Stabler, 32–34)

24. At the August 4, 1986 meeting, the final details of the parties' plan for a foreclosure and resale of assets were set. (Plaintiff's Exhibit 3)

25. On August 4, 1986, Vantage Steel Corporation was incorporated in the Commonwealth of Pennsylvania by a Harrisburg attorney retained by Scharmett to handle the ministerial aspects of the incorporation proceedings. (Plaintiff's Exhibits 176, 208; Testimony of Scharmett, 164–65)

26. After its inception and for some time thereafter, Scharmett was the Secretary of Vantage. (Plaintiff's Exhibit 176; Testimony of Scharmett 174)

27. The arrangement for foreclosure and resale was agreed to by NJNB before anyone from the bank had met Steinberg. The first meeting between Steinberg and representatives of NJNB occurred on August 8, 1986. (Testimony of Steinberg, 113–14)

28. As of August 8, 1986, because of its default under the terms and conditions of the Paige loan, and due to NJNB's purported repossession of all of its assets, the Paige Group ceased doing business under its own names.

29. On October 2, 1986, I granted VATCO's summary judgment motion in the *Paige I* litigation. The principal amount of the judgement was $428,727.34, plus interest calculated at 6% per annum from November 1, 1985. Interest totaled $23,579.81, and judgment was entered in favor of VATCO in the total sum of $452,307.15. (Plaintiff's Exhibit 188)

*The August 8, 1986 Transactions*

30. At the close of business on Friday, August 8, 1986, (Plaintiff's Exhibit 156), the following transactions took place simultaneously:

a. NJNB, foreclosed upon all of the Paige Group's assets, *including accounts receivable* (Plaintiff's Exhibit 156);

b. NJNB, sold all of the Paige Group's assets, *except accounts receivable,* to Vantage; (Plaintiff's Exhibit 162)

c. Vantage purchased the inventory of Paige Steel for 50% of its book value, or $513,645; (Plaintiff's Exhibit 235)

d. NJNB gave to Vantage a revolving line of credit of up to $2 million; (Plaintiff's Exhibit 3) Vantage used approximately $513,645 of this line of credit to purchase Paige Steel's inventory; Vantage purchased the Paige Group's remaining assets, except accounts receivable, for $500,000; (Plaintiff's Exhibits 162, 235)

e. NJNB made a $500,000 term loan to Vantage and these funds were used by it to purchase the Paige Group's machinery and equipment; and (Plaintiff's Exhibit 3)

f. NJNB released the Stablers' $80,000 Certificate of Deposit security on the Paige Group's loan and exchanged it for a new personal guaranty with a ceiling amount of $200,758.00, the amount of outstanding Paige Group account receivables that Marvin Stabler believed could be easily collected. (Plaintiff's Exhibits 3, 157)

31. At the August 8, 1986 meeting, Steinberg presented NJNB with a copy of his Statement of Financial Condition. (Exhibit 211) The document incorrectly listed Mr. Steinberg's cash holdings. Rather than holding $205,000 in cash, Mr. Steinberg held about $75,000. (Plaintiff's Exhibit 211; Testimony of Jacobs, 133–34)

32. Half, or $100,000, of the $200,000 to be invested in Vantage by Steinberg came from a loan made to Steinberg by Holley Stabler. (Testimony of Marvin Stabler, 37)

33. Holley Stabler's money was obtained from a NJNB loan upon which both the Stablers were obligated. This loan was secured by the $80,000 certificate of deposit that had previously served as security for the NJNB loan to the Paige Group. To permit Marvin Stabler to obtain this new loan, NJNB released to him the $80,000 certificate of deposit it had been holding as security for the Paige Group's credit facility. (Testimony of Marvin Stabler, 35–36)

34. As part of the August 8, 1986 transaction, Vantage agreed that it would purchase from NJNB any inventory sold by the Paige Group which was returned by the customer. Any returned inventory would be purchased by Vantage at one-half the face amount of the account receivable. Any such purchase would be credited towards the satisfaction of the Stablers' guaranty, pursuant to a formula agreed upon by NJNB and Marvin Stabler. (Plaintiff's Exhibits 157, 169)

35. Over a period of time, Marvin Stabler and other Vantage employees collected the outstanding Paige Group accounts receivable the Stablers had guaranteed. (Testimony of Marvin Stabler, 72–73)

36. By no later than February 17, 1987, Marvin Stabler had collected at least $200,-758 of the Paige Group's outstanding accounts receivables. Thereafter, the Stablers had no further liability to NJNB on their guaranty. (Plaintiff's Exhibit 225 at 264)

37. The August 8, 1986 Loan and Security Agreement between NJNB and Vantage and the prior Loan and Security Agreement between NJNB and the Paige Group bore virtually identical credit terms. In fact, the former was prepared using a copy of the latter. (Plaintiff's Exhibit 220) The earlier agreement carried an interest rate of the Bank's Index Rate plus 2%, and the later one carried an interest rate of the Bank Index Rate plus 3%. (Plaintiff's Exhibit 209 at Pp. 5, 7, 9, & 10; Exhibit 163 at Pp. 4–7, 9–10)

38. The parties to the August 8, 1986 transactions rushed to complete the purported foreclosure sale because of their concern that, at any time, this court might render summary judgment in favor of VATCO in the *Paige I* litigation. In fact, "all hell broke loose" at the August 8, 1986 closing when NJNB's counsel learned that Steinberg was unable to make his full capital contribution, and Steinberg threatened to walk away from the transaction. (Testimony of Steinberg, 232–33)

39. NJNB, in its purported surrender letter to the Paige Group requiring it to surrender all assets for possession by the bank, failed to attach the Schedule "A" referenced in that letter. (Plaintiff's Exhibit 194) Schedule "A" was intended to list the items of collateral that did not have to be assembled for possession by the bank. (Plaintiff's Exhibit 156)

40. Soon after the August 8, 1986 closing, NJNB's counsel suggested that they would deem Schedule "A" to the Bill of Sale between Vantage and NJNB to be Schedule "A" to the surrender letter, until such time as the parties could prepare a revised Schedule "A" for the surrender letter. (Plaintiff's Exhibit 194)

41. Accordingly, the document which served at the closing as Schedule "A" to the surrender letter (i.e., the collateral *not* being repossessed by NJNB) constituted a document purporting to list the items of collateral that *were* purchased by Vantage in the purported foreclosure sale. (Plaintiff's Exhibit 162) There is no evidence that the parties ever bothered to prepare a revised Schedule "A" for the surrender letter.

42. The parties consummated the August 8, 1986 transaction despite the following facts:

a. Steinberg had been unable to raise the full $200,000 he had agreed to invest in Vantage. He had been able to raise only $150,000—the $100,000 borrowed from Holley Stabler and $50,000 that Steinberg borrowed from his estranged wife, Lois. (Testimony of Steinberg, 233–34)

b. Vantage had not yet obtained the consent of the Paige Group's landlord to the assignment to Vantage of the Paige Group's leases on its places of business in Newtown, Pennsylvania and Robbinsville, New Jersey. (Plaintiff's Exhibit 169)

c. Steinberg and the Stablers had not provided NJNB with their personal financial statements. (Plaintiff's Exhibit 169)

d. Vantage had not entered into a Cash Management Agreement with NJNB as required by the Loan Agreement. (Plaintiff's Exhibit 169)

e. The parties had not agreed to the appropriate disposition of the automobiles owned and leased by the Paige Group. (Plaintiff's Exhibits 194, 199)

43. The omissions, haste, and informality described above make clear that these transactions were a matter of form rather than substance. The result was that, on paper at least, the assets of the Paige Group were removed from the reach of the Paige Group's unsecured creditors, most notably VATCO.

*The August 8, 1986 Agreements between Steinberg and the Stablers*

44. On August 8, 1986, Steinberg delivered to Holley Stabler a Note and Security Agreement providing that:

a. Holley Stabler's $100,000 loan would bear no interest and would be secured by 1,667 of the 2,000 of the outstanding shares of Vantage, or 83.35% of the outstanding shares;

b. the note was payable on demand at any time; however, Holley Stabler's rights to recover the loan were limited to recourse against the stock which served as security, unless Steinberg violated the covenants in the note;

c. Steinberg would deliver to Holley Stabler an irrevocable proxy permitting her to exercise all voting rights ascribed to the stock serving as security; and

d. Steinberg would not, without the written permission of Holley Stabler, sell or encumber any of the assets of Vantage, declare any dividends on Vantage's stock or permit any substantial change in

the management of Vantage. (Plaintiff's Exhibit 187)

45. On August 8, 1986, Steinberg delivered to Holley Stabler a proxy for 1,667 shares of Vantage stock. (Plaintiff's Exhibit 189) This was held in escrow until Steinberg came up with the rest of his capital contribution. (Testimony of Scharmett, 185–86)

46. Thus, between August 8, 1986 and September 8, 1986 when Steinberg invested his remaining $50,000 into Vantage, Holley Stabler controlled the voting rights to 83.35% of Vantage's stock.

47. After September 8, 1986, when Steinberg completed his capital contribution to Vantage, a second set of agreements between Holley Stabler and Steinberg became effective and remain in effect. (Testimony of Marvin Stabler, 82–84) The second set of agreements are identical to the Stock Option Agreement, Proxy, and Note and Security Agreement described above except that:

a. the Note and Security Agreement is secured by 1,000 shares of Vantage stock (Plaintiff's Exhibit 186);

b. Steinberg's proxy to Holley Stabler represents 1000 shares of stock, or 50% of the shares (Plaintiff's Exhibit 183);

c. Holley Stabler's Stock Option Agreement permits her to purchase Steinberg's remaining shares of stock in Vantage for $100,000, the amount of Steinberg's initial investment in the company. (Plaintiff's Exhibit 184)

48. The Stock Option Agreement is independent of the Note and Security Agreement outlined above. Holley Stabler may demand 1,000 shares of stock from Steinberg in satisfaction of the Note and Security Agreement *and* purchase the remaining 1000 shares of Vantage stock from Steinberg for $100,000, his capital contribution to the company.

49. Since the Stock Option Agreement does not require Holley Stabler to purchase all of Steinberg's Vantage stock, for $100 she could own a controlling interest in Vantage by simultaneously demanding payment under her note and exercising her

right to purchase one share of stock under the Stock Option Agreement.

50. Holley Stabler has no interest independent of Marvin Stabler's interest in owning or operating a steel processing business. Holley Stabler would have exercised her proxy if her husband had asked. (Testimony of Holley Stabler, 24, 26–27) Holley Stabler was made the beneficiary of the various agreements with Steinberg to conceal Marvin Stabler's interest in Vantage. (Testimony of Scharmett, 172–73) In fact, the first time Holley Stabler met Steinberg was at the August 8, 1986 closing. (Testimony of Holley Stabler, 18) The money she lent to him was borrowed by Marvin Stabler and delivered to Steinberg by a check from the Stablers' joint account. (Testimony of Marvin Stabler, 35–36)

51. Although Scharmett, Steinberg, and Marvin Stabler each testified that they did not intend the agreements to operate independently of each other so as to permit Holley Stabler to buy out Steinberg's 50% interest in Vantage, their testimony is outweighed by the following evidence:

    a. the agreements, on their faces, are independent and offer entirely separate rights to Holley Stabler;

    b. the Stock Option Agreement contains an integration clause (Exhibit 184 at ¶ 12); and

    c. Scharmett was advised by counsel for VATCO at his deposition that the documents on their face operated independently. Scharmett concedes that this is true. (Testimony of Scharmett, 201–202) Nonetheless, the parties never executed revised agreements to reflect their alleged "true intent."

*Additional Facts Supporting the Allegations that the August 8, 1986 Transactions Should be Collapsed Into a Single, Integrated Transaction*

52. August 11, 1986 was a Monday and the first business day after August 8, 1986. The documents reflect that the "foreclosure" occurred at 5:00 p.m. on August 8 and the NJNB "sale" to Vantage took place a moment later. (Plaintiff's Exhibit 156) Thus, not one minute of business was lost from the time Marvin Stabler stopped conducting business as "Paige" and began business as "Vantage."

53. On August 11, 1986, and thereafter, Marvin Stabler was an officer of Vantage. (Testimony of Marvin Stabler, 48–49)

54. The Paige Group's list of employees on August 8, 1986 and Vantage's list of employees on August 11, 1986 are identical with the exception that Steinberg is added to the latter.

55. As of August 11, 1986, and for a significant time thereafter, the offices of Vantage were the same as those used by the Paige Group. (Plaintiff's Exhibit 169)

56. Vantage continued to use the Paige Group's telephone number. (Testimony of Marvin Stabler, 56)

57. Both the 1984 and the 1986 NJNB loan agreements with the Paige/Vantage entity contained a warranty by the borrower that it is "primarily engaged in the business of a steel service center specializing in the processing and sale of secondary galvanized steel and business relating directly thereto." (Plaintiff's Exhibits 163 at p. 17 and 209 at p. 18)

58. Each portion of the transaction was dependent upon the occurrence of the other. For example, Marvin Stabler would not have permitted NJNB to foreclose on the Paige assets if NJNB had not simultaneously agreed to sell them to Vantage and to extend Vantage a credit facility which could be used to purchase them.

59. The loan proceeds used by Vantage to purchase the assets were obtained after negotiations between Marvin Stabler, Scharmett, and NJNB. Marvin Stabler was the owner of the Paige Group. Scharmett was counsel to both the Stablers, personally, and to the Paige Group. Steinberg, the purported owner of record of Vantage, was not represented at these negotiations, except to the extent that Scharmett acted in that capacity.

60. NJNB did not bear any risk of loss of any of the assets upon which it purportedly foreclosed. (Testimony of Jacobs, 152–53)

61. Scharmett kept a single closing binder for all the events of August 8, 1986. (Testimony of Scharmett, 172)

*Efforts to Conceal the August 8, 1986 Transactions*

62. After the August 8, 1986 closing, and as part of the effort to conceal the events of that date (most particularly Marvin Stabler's interest in Vantage and Vantage's relationship to the Paige Group), Scharmett and Marvin Stabler prepared a letter, dated August 22, 1986, which was sent out over Marvin Stabler's signature to all of Paige Steel's creditors. (Plaintiff's Exhibit 212)

63. The August 22, 1986 letter made the following untrue or misleading statements:

a. that, at the end of *July*, 1986, the Paige Group's lender had foreclosed on Paige Steel's assets and "since" resold them; and

b. that Marvin Stabler was personally liable to Paige's lender for Paige's obligations, which Marvin Stabler described as "more than $300,000." (Plaintiff's Exhibit 212)

64. Marvin Stabler's purpose in sending the letter was to convince his unsecured creditors that it would be futile to scrutinize the transaction whereby Paige Steel's assets were purportedly foreclosed upon by Paige's secured lender. He did this by stating that a significant amount of secured debt remained outstanding which would take precedence over the unsecured debt in the event any remaining assets were found in the hands of Paige Steel. (Plaintiff's Exhibit 212)

65. The letter failed to identify the purchaser of the assets as Vantage, thereby making it difficult for any creditor to follow Paige's assets into the hands of their new owner. (Plaintiff's Exhibit 212) The letter also failed to disclose the Stablers' controlling equity interest in Vantage.

66. By stating that the foreclosure took place at the end of July, 1986, the letter concealed the instantaneous relationship between the foreclosure and the sale of the assets.

67. The efforts to conceal the August 8, 1986 transaction and the structure of the transaction itself establish that Stabler intended to hinder and delay collection by, and to defraud, Paige Steel's unsecured creditors, including VATCO.

68. The Stablers used Vantage as their instrument to attempt to take the assets of Paige Steel free from VATCO's claim and to preserve their equity position in the business.

69. After plaintiff obtained its judgment against Paige in October 1986, it pursued discovery in aid of execution, seeking to ascertain the location and ownership of Paige assets, and to explore the ramifications of the "foreclosure" transaction described in Stabler's letter of August 22, 1986. Plaintiff's discovery efforts were met with objections at every stage. Eventually, the defendants were compelled to respond to plaintiff's inquiries. But, when Mr. Stabler was first deposed in January 1987, he lied under oath in several material respects; Stabler sought to create the impression that he knew very little about the August 8 transactions, that he had no part in negotiating with Steinberg, and that the Stablers had no ownership interest or participation in Vantage.

*Plaintiff's Prejudice, and Miscellaneous Matters*

70. The fair market value of Paige's inventory as of August 8, 1986 closely approximated its book value, and was at least $1 million.

71. On August 8, 1986, and for a considerable period of time before that date, the Paige Group, including each of the corporations under the common control of Stabler, was insolvent.

72. As of August 8, 1986, immediately before the transactions discussed above, the value of the Stablers' assets subject to potential execution in satisfaction of their guaranty obligations to NJNB was approximately $300,000. (This finding is based upon financial statements submitted by the Stablers, adjusted downward to reflect some lack of confidence in their precise accuracy, and to reflect the slippage which

would probably have occurred in the execution process).

*73.* The amount which could have been realized if the assets of the Paige Group had been sold at auction (*i.e.*, in a forced liquidation) would probably not have exceeded $700,000. (The bank had obtained an appraisal suggesting that the "auction value" of the inventory was $337,000, and of the equipment was $186,600, for a total appraisal of $523,800. I believe this assessment represents a very conservative "worst case" scenario, and that, particularly in view of the nature of the inventory, a substantially greater price could have been obtained. I do not believe the bank would have been acting reasonably had it liquidated its security interest for the price reflected in its appraisals).

## DISCUSSION

As of August 8, 1986, immediately before the challenged transactions, Paige was a going business with assets worth in the neighborhood of $1.7 million ($1 million in inventory, at least $500,000 in machinery and equipment, and at least $200,000 in collectible accounts receivable). Paige owed its secured creditor, the bank, approximately $1.5 million, but that indebtedness was also guaranteed by the Stablers, whose assets were approximately $300,000. It owed its unsecured creditors approximately $800,000, more than half of which was owed to the plaintiff.

Immediately after the close of business on August 8, 1986, as a result of the challenged transactions, Paige had no assets and no secured debt (the bank's $1.5 million obligations having been effectively cancelled, and a substantial portion assumed by Vantage), but it still owed its unsecured creditors the same $800,000.

From the bank's perspective, the net effect of the challenged transactions was to change the name of the obligor, shore up its future prospects by the infusion of $200,000 from Steinberg and the Stablers, add the personal guaranty of Mr. Steinberg, and enhance the firm's future prospects (by eliminating the unsecured debt and reducing the risk of involuntary bankruptcy).

From the Stablers' viewpoint, they formerly owned 100% of a corporate entity which had secured obligations of $1.5 million guaranteed by them, plus $800,000 in unsecured debt, and which was hopelessly insolvent and facing bankruptcy. As a result of the challenged transactions, they now effectively own 50% (and have an option to acquire the remaining 50%, or any part thereof) of a corporation which owes the bank about the same amount (but is not in default); while they have also personally guaranteed these obligations, the likelihood of immediate claims against them on their guaranty has disappeared, and there is another guarantor on the scene.

As can be readily perceived, the August 8 transactions were eminently reasonable insofar as the bank and the Stablers were concerned, and, it may be assumed, from Mr. Steinberg's standpoint as well. It is even conceivable that, if the Paige Group had filed for reorganization under Chapter 11, some similar arrangement might have received the approval of a bankruptcy court. But this does not mean that the bank and the Stablers were free to rearrange their affairs in this fashion without notice to, approval of, or participation by the unsecured creditors, including plaintiff. In fact, there are laws against precisely this sort of thing.

Plaintiff in this action bases its claims upon three such statutory provisions: two separate sections of the Uniform Fraudulent Conveyance Act, and the Bulk Sales Act. Since the remedies under the Bulk Sales Act can be viewed as potentially more drastic, I turn first to a discussion of the applicability of that statute.

■ Under the provisions of the Uniform Commercial Code—Bulk Transfer laws, 13 Pa.C.S. § 6103 *et seq.*, a firm may not dispose of its business assets by sale to another, without first giving advance notice to its creditors. Viewed as a single transaction, there can be no doubt that the August 8 events amounted to a sale by Paige of all of its assets to Vantage; and it is undisputed that no advance notice was

given to the creditors, including plaintiff. In the case of a bulk transfer in violation of the statute, the purchaser can be held liable to the creditors. But § 6103(3) provides an exemption for "transfers in settlement or realization of a lien or other security interest". If the August 8 transactions were viewed as a genuine transfer of assets from Paige to the bank in settlement of the bank's secured claims, the plaintiff's claims under this statute would, obviously, lack merit. Although, as will be discussed below, I am satisfied that the August 8 events should be treated as a single transaction for purposes of the fraudulent conveyance statute, I need not decide whether the same unitary approach would be appropriate under the Bulk Sales statute, because I have concluded that plaintiff's claims under the Bulk Transfer laws are untimely. 13 Pa.C.S. § 6111 provides:

"No action under this division shall be brought nor levy made more than six months after the date on which the transferee took possession of the goods unless the transfer has been concealed. If the transfer has been concealed, actions may be brought or levies made within six months after its discovery."

Mr. Stabler's August 22, 1986 letter was received by the plaintiff not later than September 4 or 5, 1986. Notwithstanding the omissions and misrepresentations contained in that letter, and notwithstanding Stabler's subsequent efforts to mislead, the fact remains that the August 22 letter made clear to plaintiff and the other creditors of Paige that Paige had disposed of all of its assets. This was enough information to rule out a conclusion that "the transfer has been concealed" within the meaning of the statute, and surely should have alerted the creditors to the need for prompt further inquiry. There was no effort to conceal the fact that the same personnel were continuing to conduct business at the same location under a different name; and there is no basis for suggesting that the bank—whose identity and involvement were well known to the creditors—was guilty of any concealment or misrepresentation. So far as the evidentiary record is concerned, there is no basis for tolling the six-months'

limitations period. The bulk transfer aspects of the case will therefore not be discussed further.

The circumstances set forth in the Findings of Fact and discussed above justify, in my view, disregard of the formalities attempted to be employed by the parties. And viewing the transactions realistically, we have: a sale of all of the assets of the Paige Group to Vantage, financed by the bank on the strength of a security interest in the same assets, plus a relatively minor infusion of cash from Steinberg and the Stablers. Contrary to defendants' argument, the overall transaction had many of the characteristics of a leveraged buyout, and was similar to the transactions analyzed in *U.S. v. Tabor Court Realty*, 803 F.2d 1288 (3d Cir.1986), *cert. denied, McClellan Realty Co. v. U.S.*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987), in which the Court upheld the propriety of telescoping a series of transactions into a single consolidated unit, without regard to the formalities adopted by the parties.

■ Section 357 of the Pennsylvania Fraudulent Conveyance Act, 39 Pa.S.A. § 357, provides:

"Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors."

Violation of that statute is established by proof (1) that a conveyance occurred; (2) that a purpose of the conveyance was to hinder, delay or defraud creditors; (3) that the purchaser knew of the fraud and did not pay fair consideration for the conveyance; and (4) that the creditors were prejudiced by the conveyance. *See U.S. v. Gleneagles*, 565 F.Supp. 556 (M.D.Pa.1983) (*aff'd sub. nom., U.S. v. Tabor Court Realty, supra.*

Section 354 of the same statute, 39 Pa. S.A. § 354, provides:

"Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without re-

gard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration."

Section 359 of the same statute, 39 Pa. S.A. § 359(1)(a), (b) sets forth the remedies available to a creditor who successfully establishes that the conveyance was fraudulent under either § 354 or § 357. The creditor may either have the conveyance set aside to the extent necessary to satisfy his claim, or disregard the conveyance, and levy execution upon the property conveyed. But the creditor may not pursue assets in the hands of a "purchaser for fair consideration without knowledge of the fraud at the time of the purchase." § 359(1).

■ As of August 8, 1986, the Paige Group was insolvent. There was undoubtedly a conveyance. A principal purpose of the conveyance was to preclude plaintiff and the other unsecured creditors from proceeding against Paige's assets. And it is clear that Vanguard, Steinberg and the Stablers were all fully aware of the purpose and effect of the transaction. Thus, the only remaining issues are whether the Paige Group received fair compensation for the assets, and whether plaintiff was prejudiced by the transaction.

I have found as a fact that the Paige Group's inventory was worth at least $1 million as of August 8, 1986. The inventory had cost somewhat more than that sum, and the undisputed evidence shows that virtually all of the inventory (steel coils, and other forms of steel) was not subject to depreciation, but had increased in value to the extent it represented processed goods or work in progress. Indeed, immediately after the August 8 transactions, both the bank and Vantage valued the inventory at $1,027,290 in connection with the new line of revolving credit extended to Vantage by the bank. But Vantage was permitted to purchase the entire inventory for $513,645. Moreover, as plaintiff correctly points out, Vantage received far more than the inventory: it acquired Paige's offices, employees, good will, customer lists and all of the other elements of "going concern". On this record, it is simply impossible to conclude that Vantage paid fair value for the conveyance.

Defendant's arguments to the contrary focus upon the form rather than the substance of the transaction. Defendant argues that the bank merely foreclosed upon assets which secured its $1.5 million debt. Cancellation (as a practical matter, it is argued, the bank has forgiven and cancelled Paige's original obligations) of a $1.5 million obligation represents adequate consideration for all of the assets of the Paige Group. Whether the bank did or did not receive full value from Vantage is of no concern to the plaintiff.

For several reasons, I find these arguments unpersuasive. In the first place, if the bank had not made its deal with the Stablers, and had attempted to enforce its security arrangement by repossessing and selling the Paige assets, bankruptcy would undoubtedly have been triggered. In bankruptcy, the unsecured creditors would undoubtedly have insisted upon compelling the bank to enforce its guaranty obligations against the Stablers, rather than rely solely upon the Vantage assets. Thus, in bankruptcy, there might well have been some balance available for unsecured creditors such as plaintiff, even in a Chapter 7 liquidation. The more likely prospect would have been a Chapter 11 reorganization, and as matters stood on August 8, 1986, there might well have been a reasonable prospect of successful reorganization which would have yielded significant payments to unsecured creditors. Moreover, plaintiff, as a principal unsecured creditor, would have been a major player in any such reorganization proceeding.

In any event, as discussed previously, this was really a conveyance from Paige to Vantage, with the acquiescence of the bank, for the purpose of avoiding the claims of unsecured creditors. And there can be no doubt that Vantage did not pay full value, as discussed previously.

Various other modes of analysis lead to the same result. As an officer, director, and sole shareholder of Paige, Stabler owed a fiduciary obligation to Paige and to Paige's creditors. The Vantage arrange-

ment with the bank represented a corporate opportunity which should have inured to the benefit of Paige and its creditors. Or, it can perhaps be said that the creation of Vantage should be regarded as merely a continuation of the same corporate entity under a different name. The assets really still belong to the Paige Group, and have merely been refinanced.

Under each of these possible analytical approaches, the real problem is determining the extent to which plaintiff and the other unsecured creditors have been prejudiced, and how such prejudice should be remedied.

■ As against the defendant Vantage, the solution seems relatively straightforward: either Vantage should be regarded as the alter ego of Paige, still liable for Paige's debts; or, under the fraudulent conveyance statute, Vantage is a transferee with knowledge of the fraud who did not pay full value, and plaintiff can therefore disregard the conveyance to the extent necessary to satisfy plaintiff's claims. Plaintiff will therefore be granted a judgment against Vantage in an amount corresponding to the unpaid balance of its earlier judgment against Paige.

With respect to the defendants Marvin F. Stabler and Holley Sue Stabler, the appropriate remedy is somewhat more elusive. To the extent of the consideration they have received in exchange for the Paige assets, they have been unjustly enriched at the expense of plaintiff and the other unsecured creditors of Paige. It is therefore appropriate to impress upon the stock or other evidence of ownership or indebtedness which they received in exchange for the conveyance of Paige asset a trust for the benefit of the unsecured creditors of Paige.

Since the ultimate goal is to achieve the equivalent of rescission of the Paige–Vantage conveyance, and since cancellation of the Stablers' guarantees of the secured debt of Paige was a part of the consideration-mix for that transaction, and may have prejudiced plaintiff and the other unsecured creditors of Paige, it is appropriate to enter a declaratory judgment to the effect that, insofar as plaintiff is concerned, the Stablers' original guarantees remain in effect.

An appropriate Order follows.

## ORDER

AND NOW, this 14th day of November, 1989, it is ORDERED:

1. Judgment is entered in favor of plaintiff and against the defendant Vantage Steel Corporation in the sum of $520,-070.06.

2. It is ORDERED, ADJUDGED AND DECLARED that the ownership interests of the defendants Marvin Stabler and Holley Sue Stabler in Vantage Steel Corporation are held in trust for the benefit of the unsecured creditors of the Paige Group.

3. It is FURTHER ORDERED, ADJUDGED AND DECLARED that to the extent the personal guarantees previously given by Marvin Stabler and Holley Sue Stabler, or either of them, guaranteeing payment of the obligations of the Paige Group were reduced or cancelled in conjunction with the conveyance of the assets of the Paige Group to Vantage Steel Corporation, said personal guarantees shall be deemed to continue in effect, insofar as the plaintiff is concerned. That is, to the extent that purported reduction or cancellation of the Stablers' personal guarantees may have had the effect of impairing the collectibility of plaintiffs' judgment against Paige, such cancellation/reduction shall be deemed null and void, and the personal guarantees remain in effect in full.