919 F.2d 206
 VOEST-ALPINE TRADING USA CORPORATION
v.
VANTAGE STEEL CORPORATION, Cypress International
Corporation, Paige Steel, Inc., Paige Industries,
Inc., Paige Steel Processing, Inc.,
Stabler, Marvin F. and
Stabler, Holley Sue
Vantage Steel Corporation, Marvin F. Stabler and Holley Sue
Stabler, Appellants.
 No. 89-2045.
 United States Court of Appeals,
Third Circuit.
 Argued May 31, 1990.
Decided Nov. 13, 1990.
 
 Patrick Kittredge (Argued), Gardenia L. Brooman, Kittredge, Donley, Elson Elson, Fullem & Embrick, Philadelphia, Pa., for appellants.
 Stewart Dalzell (Argued), Mary E. Kohart, Drinker, Biddle & Reath, Philadelphia, Pa., for appellee.
 Before STAPLETON, HUTCHINSON and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 This appeal arises from an action filed in the District Court for the Eastern District of Pennsylvania by the plaintiff-appellee Voest-Alpine Trading USA Corp. (hereinafter, "VATCO") claiming that the defendant-appellants, Vantage Steel Corporation ("Vantage"), Marvin F. Stabler, and Holley Sue Stabler[1] (hereinafter, "Stabler") had, to the detriment of VATCO and other creditors, transferred the assets of one corporation controlled by the Stablers (Paige Steel Corp.) to another corporation established and controlled by them (Vantage), in such a manner as to violate the Uniform Fraudulent Conveyance Act, as adopted in Pennsylvania, 39 P.S.A. Secs. 351-63.
 
 
 2
 While this case was pending in the district court, where it had been brought on June 5, 1987, Vantage filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. VATCO was granted relief from the stay provisions of 11 U.S.C. Sec. 362 in an Order of the Bankruptcy Court dated December 30, 1988. In a bench trial, the district court after extensive fact-finding, held that Paige assets were fraudulently conveyed to Vantage and entered judgment for VATCO on November 14, 1989 in the amount of $520,070.06. 732 F.Supp. 1315. The district court also ordered certain equitable relief against the Stablers intended to accomplish the equivalent of a rescission of that conveyance.
 
 
 3
 We have diversity jurisdiction under 28 U.S.C. Sec. 1332(a). Vantage and the Stablers filed a timely appeal of the district court's final Order of November 14, 1989. 28 U.S.C. Sec. 1291.
 
 
 4
 We affirm in part but reverse so much of the district court's Order as provided that certain guarantees given by the Stablers to the New Jersey National Bank ("NJNB") inure to the benefit of VATCO.
 
 I.
 
 5
 Vantage, a now-bankrupt Pennsylvania steel fabricator, is a successor to the Paige Group, a group of several now-defunct companies under the 100% control of Marvin and Holley Sue Stabler. The Paige Group was effectively dissolved in a series of transactions (described infra at 209-10) that took place on August 8, 1986. Vantage, itself also under the effective control of the Stablers, emerged out of the corporate reorganization as the successor to Paige, which had transferred and conveyed the Paige Group's assets to Vantage.
 
 
 6
 The commercial transaction underlying this appeal took place in August 1985. At that time, VATCO sold Paige $528,727 worth of steel, for which it received $100,000 on account. No further payments were made. VATCO soon thereafter filed suit in the District Court for the Eastern District of Pennsylvania. Paige did not contest the action, and VATCO on June 12, 1986 moved for summary judgment. On October 2, 1986, summary judgment was granted in favor of VATCO in the amount of $452,307.15.[2] VATCO's judgment resulted in VATCO's becoming Paige's largest unsecured creditor, to the extent of about 50% of Paige's unsecured debt.
 
 
 7
 On June 13, 1986, the day after VATCO filed for summary judgment against Paige, the Stablers, through their attorney in that action and in conjunction with their secured lender, New Jersey National Bank (NJNB), to which they owed over $1.5 million, put the Paige Group up for sale. At the end of July 1986, Marvin Stabler and his attorney proposed to NJNB that Stabler form a new company that would, with financing from NJNB, purchase Paige's assets. That purchase was found by the district court to have been structured "through a 'foreclosure' by NJNB in order to launder the assets [in question] and cleanse the Paige Group of its unsecured debt." Finding of Fact No. 20.
 
 
 8
 Friday, August 8, 1986 witnessed a series of simultaneous transactions, which the district court found to have been in reality a single integrated and fraudulent transaction whose purpose and effect was to convey assets, at less than fair value, from the old corporation, Paige, to the new corporation, Vantage, without exposing them to Paige's creditors. Findings of Fact No. 30, 43, 52-61. Through these transactions, the Stablers were able to freeze out VATCO and other unsecured Paige creditors while maintaining for themselves an equity interest in, and full effective control over, the new firm, Vantage. Finding of Fact No. 68.
 
 
 9
 The following transactions took place simultaneously at 5:00 p.m. on August 8, 1986: (1) NJNB foreclosed on all Paige assets, including receivables; (2) NJNB sold all of those assets, other than receivables to Vantage;[3] (3) Vantage purchased the Paige inventory for $513,645 or about half of its book value; (4) NJNB gave Vantage a $2 million revolving line of credit, $513,645 of which was used immediately to purchase the Paige inventory and another $500,000 of which was used to purchase Paige's other assets (except receivables);[4] (5) NJNB made a term loan to Vantage of another $500,000 for the purpose of buying Paige's machinery and assorted equipment; (6) NJNB released an $80,000 Stabler Certificate of Deposit it had been holding as security for the Paige loan and exchanged it for a new personal guarantee by the Stablers of $200,758--the approximate amount of outstanding Paige receivables, and an amount that was in fact collected within six months.
 
 
 10
 Thus, on Monday morning August 11, 1986 Vantage opened for business with Stabler as an officer of Vantage and with the same address, staff, office, telephone number, and assets that Paige had closed with at the end of the day on Friday, August 8. Findings of Fact No. 52-56.
 
 
 11
 Before the foreclosure, Paige was a troubled but going business with assets of over $1.7 million,[5] a debt to NJNB of $1.5 million (guaranteed by the Stablers whose known assets were about $300,000),[6] and debts to unsecured creditors of about $800,000, which included the debt owed to VATCO. After the August 8, 1986 transactions, Paige had no assets and no secured debts. It did, however, continue to owe its unsecured creditors, who for their part, however, now had no Paige assets from which to collect.
 
 
 12
 Stabler, with the assistance of his attorney and over his own name, on August 22, 1986 sent a letter on Paige stationery to all of Paige's creditors advising them that "there are no assets remaining with which to make any payments on Paige's account...." After expressing his disappointment that "Paige could [not] restructure its financing to continue in business," Stabler described the recently executed combined transactions as follows:
 
 
 13
 At the end of July Paige's lender discontinued further extensions of credit and foreclosed on Paige's assets, as permitted under the loan agreement. Our lender has since sold Paige's assets, and after applying the proceeds of the sale to the loan, Paige continues to have more than $300,000 of secured debt outstanding. I remain personally liable ... and have had to pledge my assets to secure this obligation.
 
 
 14
 The district court, in its Findings of Fact No. 64-68, characterized Stabler's purpose in sending the letter, in failing to identify the asset purchaser as Vantage, and in concealing the relationship between the foreclosure and the sale of assets, as an attempt to conceal the August 8, 1986 transaction with the intent to defraud Paige's unsecured creditors, including VATCO. In addition, the district court found that Vantage was used as an instrument to preserve the Stablers' equity in the new business. Findings of Fact 64-68 read as follows:
 
 
 15
 64. Marvin Stabler's purpose in sending the letter was to convince his unsecured creditors that it would be futile to scrutinize the transaction whereby Paige Steel's assets were purportedly foreclosed upon by Paige's secured lender. He did this by stating that a significant amount of secured debt remained outstanding which would take precedence over the unsecured debt in the event any remaining assets were found in the hands of Paige Steel....
 
 
 16
 65. The letter failed to identify the purchaser of the assets as Vantage, thereby making it difficult for any creditor to follow Paige's assets into the hands of their new owner.... The letter also failed to disclose the Stablers' controlling equity interest in Vantage.
 
 
 17
 66. By stating that the foreclosure took place at the end of July, 1986, the letter concealed the instantaneous relationship between the foreclosure and the sale of the assets.
 
 
 18
 67. The efforts to conceal the August 8, 1986 transaction and the structure of the transaction itself establish that Stabler intended to hinder and delay collection by, and to defraud, Paige Steel's unsecured creditors, including VATCO.
 
 
 19
 68. The Stablers used Vantage as their instrument to attempt to take the assets of Paige Steel free from VATCO's claim and to preserve their equity position in the business.
 
 
 20
 VATCO was one of the recipients of Stabler's letter of August 22. Not long thereafter, on October 2, 1986, VATCO was granted summary judgment in its earlier action against Paige for $452,307.15. VATCO then pursued discovery in aid of execution of its judgment. VATCO's discovery efforts, according to the findings of the district court, "were met with objections at every stage," and, when finally deposed in January 1987, Stabler "lied under oath in several material respects."[7]
 
 
 21
 Finally, VATCO brought this suit against Vantage and the Stablers in June 1987, alleging, among other grounds,[8] that they had violated the Uniform Fraudulent Conveyance Act, 39 P.S.A. Secs. 351-63. As earlier noted, Vantage itself filed in chapter 11 bankruptcy on November 30, 1988, while VATCO's instant suit was pending in the district court.
 
 II.
 
 22
 In his Memorandum and Order of November 14, 1989, which followed a non-jury trial, the district court judge found that the Stablers had engineered a fraudulent conveyance of assets from Paige to Vantage. He therefore ruled for VATCO, awarding it both money and equitable remedies. In addition to: (1) awarding VATCO $520,070.06, the current value of the earlier judgment against Paige, the district court judge, acting in equity, also (2) impressed a constructive trust on the ownership interests of the Stablers in Vantage for the benefit of the unsecured creditors of Paige, and (3) ordered reinstitution of the personal guarantees of the Stablers, which had run from Paige to NJNB and which had been canceled as part of the consideration mix in the fraudulent Paige-Vantage conveyance, to the extent that the cancellation of those guarantees impaired VATCO's ability to collect its judgment against Paige.
 
 III.
 
 23
 Vantage and the Stablers here challenge both the district court's findings of fact and conclusions of law as well as the remedies it ordered. In reviewing the district court's factual findings as to the Paige-Vantage transactions, the value of the Paige inventory conveyed to Vantage, prejudice to VATCO and other unsecured creditors of Paige, as well as all other factual determinations, we will not disturb any finding unless it is clearly erroneous.
 
 
 24
 In reviewing the district court's interpretation of the Pennsylvania Fraudulent Conveyance Act, 39 P.S.A. Secs. 354-59, the conclusions of law at which the district court arrived, and the legal bases for the remedies it prescribed, our standard of review is plenary.
 
 
 25
 Finally, our standard of review for considering the equitable remedies ordered by the district court, and for which a legal basis exists, is whether the district court properly exercised its discretion. U.S. v. Tabor Court Realty Corp., 803 F.2d 1288, 1301 (3d Cir.1986); Evans v. Buchanan, 555 F.2d 373, 378 (3d Cir.1977).
 
 IV.
 
 26
 The district court's extensive factfinding led to its conclusion that the August 8, 1986 conveyance of assets from Paige to Vantage for less than fair value was a knowing and purposeful effort to preclude VATCO and other unsecured creditors from reaching Paige's assets. It concluded that the conveyance was, in effect, a sham transaction intended to defraud Paige's unsecured creditors.[9] Finding of Fact No. 67.
 
 
 27
 In other words, Vantage was the Stablers' instrument for acquiring Paige's assets at less than fair value and free from claims by unsecured creditors while, at the same time, securing the Stablers' own equity position. Consequently, Vantage might "be regarded as merely a continuation of the same [Paige] corporate entity under a different name" (Dist.Ct.Op. at 29) as well as the beneficiary of a breach of fiduciary duties by the officers of Paige, who should have sought to maximize the return on sale of its assets, rather than conveying those assets fraudulently to Vantage for half their fair value.
 
 
 28
 The district court arrived at these conclusions on the basis of some 73 individual findings of fact. Our review of the record reveals that none of those findings of fact, including the lack of good faith[10] on the part of Vantage and the Stablers, was clearly erroneous. These findings may be clustered around the three determinative issues: a) were the transactions of August 8, 1986 effectively a single, integrated transaction that functioned as a subterfuge; b) was the district court's assessment of the true fair value of Paige's inventory at something in excess of $1 million an accurate assessment; and c) were Paige's creditors, among them VATCO, prejudiced, as a matter of fact, by the August transactions? The district court found the answer to all three questions to be "yes." We agree and reject the challenge to those findings made here on appeal by Vantage and the Stablers.
 
 A.
 
 29
 Evidence that the transactions of August 8 were, as a factual matter, in reality a single transaction functioning as a subterfuge was abundant. The evidence, including testimony from the various participants in the transaction, was assessed by the district court, which summarized its findings on this key issue in Findings of Fact No. 58 and 67:
 
 
 30
 58. Each portion of the transaction [of August 8, 1986] was dependent upon the occurrence of the other. For example, Marvin Stabler would not have permitted NJNB to foreclose on the Paige assets if NJNB had not simultaneously agreed to sell them to Vantage and to extend Vantage a credit facility which could be used to purchase them.
 
 
 31
 67. The efforts to conceal the August 8, 1986 transaction and the structure of the transaction itself establish that Stabler intended to hinder and delay collection by, and to defraud, Paige Steel's unsecured creditors, including VATCO.
 
 
 32
 These findings, which were supported by evidence and are not erroneous, refute the claim made here by Vantage and the Stablers that, since NJNB was contractually entitled to foreclose, its decision to do so makes it impossible to consider the foreclosure a part of the conveyance. On the contrary, the evidence is clear that absent the Stabler initiative to have NJNB foreclose as part of the transaction, there would have been no NJNB foreclosure. As VATCO correctly put it, "the record is undisputed that the bank foreclosed at the request of Stabler and Scharmett [Paige's, Vantage's and the Stablers' attorney] and at a time and place convenient to them." Appellee's Brief at 16.
 
 
 33
 The Stablers and Vantage also insist that the district court, in collapsing the August 8, 1986 transactions into a single, integrated conveyance, improperly relied on U.S. v. Tabor Court Realty Corp., 803 F.2d 1288 (3d Cir.1986). They claim that because Tabor Court Realty addressed a complex leveraged buyout (LBO) involving "numerous transferors, transferees, lenders, guarantors, stockholders, agents and corporate officers" (Appellants' Brief at 25) it is not analogous to the transactions in this action. We cannot agree.
 
 
 34
 We recognize that the transaction in Tabor Court Realty was more complex and involved more money and a larger number of parties than were involved here. Nonetheless, the findings reviewed and affirmed by this court in Tabor Court Realty[11] in sustaining the collapse of the various transactions into one integral transaction are relevant and analogous to the findings made by the district court in the present case--findings that we will not disturb.
 
 
 35
 Indeed, in Tabor Court Realty, which upheld the district court's determination that the various loans and repayment schemes made there constituted one integrated transaction, we said:
 
 
 36
 Admittedly, [the arguments made against collapsing the transactions] could have some validity where the lender is unaware of the use to which loans proceeds are to be put. That is not the case here [in Tabor Court ]. IIT [the lender] was intimately involved with the formulation of the agreement whereby the proceeds of its loan were funnelled into the hands of the purchasers of the stock of a corporation that was near insolvency. Try as they might to distance themselves from the transaction now, they cannot rewrite history.
 
 
 37
 803 F.2d at 1303, n. 8. The situation here is much the same, lending substance to the district court's reliance on Tabor Court Realty, which it characterized as upholding "the propriety of telescoping a series of transactions into a single consolidated unit, without regard to the formalities adopted by the parties" (Dist.Ct.Op. at 25-26).
 
 
 38
 Our recitation of the facts provided supra, including the fact that NJNB foreclosed on Paige at the request of the Stablers,[12] and the intent of the various parties as it emerged in testimony and as it was found in the district court, supports the determination that the "Paige to NJNB" and "NJNB to Vantage" transactions constituted a single integrated transaction aimed at depriving Paige's unsecured creditors of access to Paige's assets. Thus, just as we reject the Stablers' and Vantage's complaint that the district court's findings of fact were "conclusory," we also reject their argument that the district court had no basis for collapsing the August 8, 1986 transactions into one single, integrated transaction.
 
 
 39
 Finally, the fact that the district court adopted a substantial number of findings proposed by VATCO, rather than those proposed by the Stablers, was not impermissible and does not, contrary to the claim now presented by Vantage and the Stablers, demonstrate clear error on the part of the district court judge. See, e.g., Schlensky v. Dorsey, 574 F.2d 131, 148-49 (3d Cir.1978).
 
 B.
 
 40
 39 P.S.A. Sec. 353 defines "fair consideration" as "exchange for ... a fair equivalent ... and in good faith."[13] Vantage paid Paige $513,645 for Paige's inventory. The district court found that Paige's assets were not conveyed in exchange for fair value or consideration. In Finding of Fact No. 70, the district court found that the "fair market value of Paige's inventory ... was at least $1 million" rather than the $513,645 Vantage actually paid for that inventory. On the basis of the evidence, this assessment of the value of Paige's inventory at the time of its conveyance to Vantage was not clearly erroneous,[14] and we reject Vantage's and the Stablers' argument to the contrary.
 
 
 41
 Competing appraisals of the value of Paige's inventory and assets were put into evidence at trial. The finance officer for both Paige and Vantage testified that, given the nature of the market for metal, the actual value of Paige's inventory was substantially greater than its book value of $1,026,290, itself twice what Vantage paid Paige. NJNB for loan purposes treated the inventory as worth $1 million. The far lower value proposed by Vantage and the Stablers, $337,000, was based on an estimate of the inventory's value in an auction liquidation sale--not in a sale to a going business.[15]
 
 
 42
 The Paige to Vantage transfer arranged by the Stablers was as devoid of good faith as it was devoid of fair consideration. The Stablers' knowledge that the conveyance would make Paige insolvent and strand its unsecured creditors, while at the same time providing Vantage a windfall, frustrates any claim of good faith raised by the Stablers. See Tabor Court Realty, 803 F.2d at 1296. Thus, in addition to finding that the conveyance was made in "exchange for" less than "a fair equivalent," the district court also found that the conveyance could not have taken place "in good faith" because it was in fact designed to "hinder, defraud, or delay" Paige's creditors. We are satisfied that no reason exists to disturb these findings.
 
 C.
 
 43
 The third requirement for finding a fraudulent conveyance is that creditors have been prejudiced by the transaction in question. It seems clear to us that the depletion of Paige's assets obviously hurt all of Paige's unsecured creditors, and VATCO was the largest among them, holding about 55% of Paige's unsecured debt. VATCO here makes a persuasive case that, if Vantage had paid fair consideration to Paige, there would have been up to $400,000 left over for the unsecured creditors of Paige.
 
 V.
 
 44
 Having sustained the district court's findings of fact, we turn to its application of those facts to the Pennsylvania fraudulent conveyance statute. Given its factual findings, the district court determined that the Stablers had intentionally defrauded their creditors through their conveyance of Paige's assets in violation of both Sec. 357 (actual intent) and Sec. 354 (constructive intent) of Pennsylvania's Fraudulent Conveyance Act.[16]
 
 39 P.S.A. Sec. 357 provides that:
 
 45
 Every conveyance made and every obligation incurred with actual intent ... to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors.
 
 
 46
 "[T]he existence of actual intent is a question of fact," U.S. v. Tabor Court Realty Corp., 803 F.2d 1288, 1304 (3d Cir.1986), and the evidence before the district court in the instant case was both sufficient and persuasive. The evidence of subterfuge in the testimony and exhibits was plentiful, and the district court's "infer[ences] from all the facts and circumstances surrounding the conveyance, including subsequent conduct" were by no means strained. Tabor Court Realty, 803 F.2d at 1304 (citing and quoting Pennsylvania conveyance cases).
 
 
 47
 As we have noted, the district court found considerable evidence of "actual intent" to delay or defraud creditors. The district court's construction of this section of the statute was correct, and, given the fact that we uphold the district court's factual findings, we discern no merit in the arguments made here by Vantage and the Stablers to the effect that they were without actual or constructive fraudulent intent at the time of the conveyances and that the consideration offered in exchange for the conveyance of Paige assets was fair. Appellant's Brief at 27-33. See U.S. v. Tabor Court Realty Corp., 803 F.2d 1288, 1304 (3d Cir.1986) ("the existence of actual intent is a question of fact"); Krasnov v. Dinan, 465 F.2d 1298, 1299-1300 (3d Cir.1972).
 
 
 48
 Furthermore, as this court has interpreted Pennsylvania law, even if evidence of actual intent were less ample and less persuasive, and even if the district court had not found "actual intent" as it did, the August 8, 1986 conveyance would nevertheless have been deemed fraudulent within the meaning of Sec. 354 of the statute. 39 P.S.A. Sec. 354 provides that:
 
 
 49
 Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard as to his actual intent, if the conveyance is made or the obligation incurred without a fair consideration.
 
 
 50
 Thus, even if no finding of "actual intent" in violation of Sec. 357 had been found, the fraudulent nature of the conveyance in question would still be beyond dispute. As the district court found, as of August 8, 1986 Paige was insolvent; there was a conveyance of assets; the conveyance was made for less than fair consideration. This legal conclusion emerges from the district court's findings that the Stablers had arranged a series of transactions that rendered Paige insolvent through foreclosure by NJNB while conveying Paige's assets to Vantage without fair consideration.
 
 VI.
 
 51
 The record therefore satisfies us that, based on the evidence adduced, the findings of fact made and the conclusions of law reached by the district court must be sustained. Hence we begin by affirming the first paragraph of the district court's order of November 14, 1989, which entered judgment in favor of VATCO and against Vantage for $520,070.06.
 
 
 52
 The question that then arises is whether the succeeding equitable portions of the district court's order of November 14, 1989 should be affirmed as well. We turn to that task.
 
 VII.
 
 53
 In addition to awarding VATCO $520,070.06 (the current value of the earlier judgment against Paige), the district court, acting in equity, in p 2 of its Order imposed a constructive trust on the ownership interests of the Stablers in Vantage for the benefit of the unsecured creditors of Paige. Specifically, the district court ordered that:
 
 
 54
 ... the ownership interests of the defendants Marvin Stabler and Holley Sue Stabler in Vantage Steel Corporation are held in trust for the benefit of the unsecured creditors of the Paige Group.
 
 
 55
 Recognizing that prescribing an appropriate remedy with respect to the Stablers was, in its words, "somewhat more elusive" than the judgment remedy ordered against Vantage (see Dist.Ct.Op. at 1326), the district court explained the reason for impressing a trust on the Stablers in this fashion:
 
 
 56
 To the extent of the consideration they have received in exchange for the Paige assets, they have been unjustly enriched at the expense of plaintiff and the other unsecured creditors of Paige. It is therefore appropriate to impress upon the stock or other evidence of ownership or indebtedness which they received in exchange for the conveyance of Paige asset[s] a trust for the benefit of the unsecured creditors of Paige.
 
 
 57
 After oral argument, we asked the parties to submit supplemental memoranda commenting on paragraphs 2 and 3 of the district court's order so as to satisfy ourselves that these remedies could be appropriately imposed. We are now persuaded that paragraph 2 of the district court's order was proper, in that there is a legal basis for the remedy ordered, and that the district court did not abuse its discretion in imposing a trust upon the Stablers for their ownership interests in Vantage.
 
 
 58
 We agree with the district court that the Stablers' ownership interests in Vantage must be viewed as held in trust for Paige creditors. This is necessary in order to prevent the unjust, indeed, fraudulent enrichment of the Stablers through the conveyance of the Paige assets for less than fair value and their possession of the proceeds of that conveyance in the form of present and inchoate ownership of Vantage stock. The Stablers' 50% equitable interest in Vantage; their proxy right, exercisable for $100, to obtain full control of Vantage; and the right at any time to outright ownership of Vantage through calling in their loan to the other Vantage owner, Richard Steinberg,[17] are all present and future ownership interests that properly should inure to the benefit of Paige's creditors and thus must be held in trust for them.A.
 
 
 59
 The district court's findings make clear that at the August 8, 1986 meeting at which the transaction took place, and which resulted in Vantage's obtaining Paige assets and succeeding to Paige's business, Vantage did not give fair consideration for, at the least, the inventory which was conveyed to it. In fact, in the August 8, 1986 transaction Vantage obtained Paige inventory valued at $1,027,290 for $513,645, along with all of its offices, good will, and customer lists.[18] To the extent that the consideration given was in fact $513,645 (or 50%) less than the fair value of the inventory conveyed, Vantage received assets to which Paige creditors were otherwise entitled to look for payment of their debts. Hypothetically, had Vantage paid "fair" rather than "less than fair" consideration to Paige for its inventory, transferring to Paige not only the $513,645 for inventory but in addition giving to Paige stock in Vantage for the remaining value of the inventory, there would be no question but that the stock then held by Paige would be an asset to which Paige's unsecured creditors could resort.[19]
 
 
 60
 Paige, however, received no transfer of Vantage stock. Rather, it was the Stablers, under the provisions of the August 8, 1986 agreements, who acquired virtual right to all of the Vantage stock. True, the agreement between the ostensible purchaser of Vantage, one Richard Steinberg, and the Stablers provided some rights for Steinberg. Essentially, however, the findings of fact made by the district court with respect to the ownership and control of Vantage--findings which we have sustained--leave no doubt but that it was the Stablers who, for all intents and purposes, owned and controlled Vantage after August 8, 1986.
 
 
 61
 In principle, Steinberg was scheduled to provide the new firm with a $200,000 infusion of capital.[20] Half of that sum, however, came from an interest-free loan to Steinberg by Holley Sue Stabler who obtained that $100,000 from an NJNB loan. The terms of her loan to Steinberg left her effectively in full control of Steinberg's "interest" in Vantage and, thereby, of the part of Vantage not controlled by Marvin Stabler.[21] In turn, her interests were coterminous with Marvin Stabler's.[22]
 
 
 62
 This being so, whatever ownership interests in Vantage the Stablers received as a result of the August 8, 1986 transactions had to embody all or some part of the difference between the $1,027,290 inventory Vantage received and the $513,645 value that Vantage gave. To that extent therefore, whatever the Stablers received from Vantage in the way of equity interests without paying fair consideration therefor, necessarily constitutes an asset of Vantage to which the Paige creditors are entitled.
 
 
 63
 The imposition of a constructive trust as a remedy dates back at least to Beatty v. Guggenheim Exploration Co., 122 N.E. 378, 225 N.Y. 380 (1919) (Cardozo, J.). This remedy has become a part of equitable relief both in the common law of restitution and in Pennsylvania's fraudulent conveyance statute, and has been approved by us as well as other courts of appeals. The duty of the "trustee" is to convey the property or proceeds to the parties at whose expense the trustee or grantor was unjustly enriched. Beatty, 122 N.E. at 387; Pierro v. Pierro, 438 Pa. 119, 264 A.2d 692, 695-96 (1970) (defining and impressing constructive trust on land as a Pennsylvania equitable remedy); Zions First National Bank v. United Health Clubs, Inc., 704 F.2d 120, 124 (3d Cir.1983) (imposing constructive trust as equitable lien and form of restitution mandated by Pennsylvania law where property conveyed in which another held beneficial interest).
 
 
 64
 Like most states, Pennsylvania has chosen to apply the common law of restitution and the principles of the constructive trust to remedies for violation of its fraudulent conveyance statute. See, e.g., Stauffer v. Stauffer, 465 Pa. 558, 351 A.2d 236, 241, 245 (1976) (adopting and applying constructive trust and common law of restitution to fraudulent conveyances under 39 P.S.A. Sec. 351 et seq.); Restatement of the Law of Restitution Secs. 160, 168.
 
 B.
 
 65
 The Pennsylvania Supreme Court has also held that liability will attach to a corporate officer who participates in the wrongful acts of the corporation. Wicks v. Milzoco Builders, Inc., 470 A.2d 86, 90 (Pa.1983) (Hutchinson, J.). See also Donsco, Inc. v. Casper Corp., 587 F.2d 602, 606 (3d Cir.1978) (holding same in trademark context); Gibraltar Savings v. LD Brinkman Corp., 860 F.2d 1275, 1286-89 (5th Cir.1988) (examining various grounds for attaching personal liability for wrongful corporate acts).[23]
 
 
 66
 Thus, our conclusion reached above, that the Stablers must hold their Vantage equity in trust for Paige's unsecured creditors, is bolstered by the fact that the Stablers were the sole owners and officers of Paige and would therefore be liable to disgorge whatever of value has unjustly enriched them by their participation in Paige's wrongful act. The Stablers' participation in the fraudulent conveyance made by Paige is documented in the district court's finding that the Stablers intended to hinder and delay collection and defraud Paige's unsecured creditors.[24] See Milzoco, 470 A.2d at 90. As the district court found, and as we have earlier noted, "the Stablers used Vantage as their instrument to attempt to take the assets of Paige Steel freely from VATCO's claim and to preserve their equity position in the business." Finding of Fact No. 68.[25]C.
 
 
 67
 The Stablers and Vantage have argued that imposition of a constructive trust on their ownership interests in Vantage would be an inappropriate remedy for a fraudulent conveyance because several factors prerequisite to the imposition of a constructive trust are missing here. The Stablers argue that their Vantage equity may not be the subject of a constructive trust because the res, due to Steinberg's investment in Vantage, can no longer be specifically identified. But we reject that argument, recognizing the simultaneous transfers that took place when Vantage paid less than fair consideration for Paige's inventory and, at the same time, provided the Stablers with equity in Vantage. The district court not only found that the conveyance as a whole was fraudulent, but it also found that but for that sham conveyance there would have been no Stabler equitable interest in Vantage.
 
 
 68
 We are not unaware that whatever interests the Stablers acquired from Vantage were acquired simultaneously with the transfer of Paige's assets to Vantage. The district court, as we have observed, has found that the August 8, 1986 transactions were integrated into one transaction, and that finding, in the absence of clear error, is binding upon us. Thus, because Vantage gave to Paige only one-half of the value of Paige's inventory and simultaneously provided the Stablers with an equity interest in Vantage, we have no difficulty in tracing to the Stablers the interest in Vantage that they received. That interest, in whatever form it took, at the very least represented some or all of the difference between consideration received by Vantage ($1,027,290) and that given by Vantage ($513,645). See Cunningham v. Brown, 265 U.S. 1, 12, 44 S.Ct. 424, 426-27, 68 L.Ed. 873 (1923); In Re Teltronics, 649 F.2d 1236, 1241 (7th Cir.1981); Fidelity Trust Co. v. Union National Bank of Pittsburgh, 313 Pa. 467, 169 A. 209, 215 (1933).
 
 
 69
 Thus, we are satisfied that the consideration which was not paid by Vantage to Paige on August 8, 1986, but which ended up on that same date as equity interests in the Stablers' hands, without their giving fair value for such interests, constitutes the res directly traceable to the additional $513,645 in consideration that belonged to Paige but that Vantage did not pay.
 
 
 70
 Accordingly, in the present case, whatever interests the Stablers have received from Vantage, and whatever interests they may still acquire by virtue of the exercise of any rights which they have retained under the 1986 agreements, should properly be made available to the unsecured creditors as the district court decreed. It may well be that those interests, inchoate as they may be, are without monetary value, and indeed, in light of Vantage's bankruptcy filing, those interests may never attain value. Nevertheless, to the extent that the Stablers possess any equity interest in Vantage which they received as a result of Vantage's acquiring Paige's inventory at less than fair consideration, the Stablers have been unjustly enriched at the expense of Paige's unsecured creditors. This unjust enrichment was recognized by the district court and was cured by the district court's order in paragraph 2 which established a constructive trust as to these interests in favor of the unsecured creditors.[26]
 
 
 71
 On the basis of the foregoing analysis, we also affirm p 2 of the district court's Order.
 
 VIII.
 
 72
 This brings us to the final portion of the district court's order, paragraph 3. In it, the district court declared that with the effective rescission of the Paige-Vantage transaction, the Stablers became liable to VATCO up to the amount of their own original guarantee running to NJNB on behalf of Paige. Paragraph 3 of the district court's order declared that:
 
 
 73
 ... to the extent the personal guarantees previously given by Marvin Stabler and Holley Sue Stabler, or either of them, guaranteeing payment of the obligations of the Paige group were reduced or canceled in conjunction with the conveyance of the assets of the Paige Group to Vantage Steel Corporation, said personal guarantees shall be deemed to continue in effect, insofar as the plaintiff [VATCO] is concerned. That is, to the extent that purported reduction or cancellation of the Stablers' personal guarantees may have had the effect of impairing the collectability of plaintiff's judgment against Paige, such cancellation/reduction shall be deemed null and void, and the personal guarantees remain in effect in full.
 
 
 74
 This portion of the district court's remedy was grounded in attaining "the equivalent of rescission" of the fraudulent conveyance, and
 
 
 75
 ... since cancellation of the Stablers' guarantees of the secured debt of Paige was a part of the consideration-mix for that transaction, and may have prejudiced plaintiff and the other unsecured creditors of Paige, it is appropriate to enter a declaratory judgment to the effect that, insofar as plaintiff is concerned, the original guarantees remain in effect.
 
 
 76
 Dist.Ct.Op. at 1326.
 
 
 77
 The district court found (Finding of Fact No. 10) that Paige's debt to NJNB as originally structured in 1984 amounted to a potential maximum of $4,000,000 and:
 
 
 78
 was secured by the assets of the Paige group and (1) the unconditional and coterminous personal guaranty of the Stablers, (2) a mortgage on rental property owned by the Stablers, and (3) an $80,000 certificate of deposit owned by the Stablers.
 
 
 79
 After the August 8, 1986 transaction, the Stablers were relieved of all guarantees to NJNB other than a new personal guarantee with a ceiling of $200,758--the amount of outstanding Paige account receivables that Marvin Stabler believed could be easily collected. Finding of Fact No. 30(f).[27]
 
 
 80
 The district court ordered that the pre-August 8, 1986 Stablers' guarantee be reinstated and be deemed to continue to be in effect so far as VATCO was concerned.
 
 A.
 
 81
 Notwithstanding the actions and the culpability of the Stablers, which resulted in the district court's findings of actual fraud, repeated perjury, and unjust enrichment--findings which we have sustained--we can find no basis on which we could uphold paragraph 3 of the district court's Order.
 
 
 82
 Our difficulty with this portion of the district court's order stems from the circumstance that the Stablers' guarantees in every instance ran in favor of NJNB and to no other party. The relevant provisions of the Stablers' guarantee running to NJNB are as follows:
 
 
 83
 ... in order to induce the [Bank] to make the loans or advances to the [Paige Group] as provided in the Loan Agreement, and in consideration thereof and of other good and valuable consideration, it is mutually agreed by and among the parties hereto, as follows:
 
 
 84
 SECTION 1.--GUARANTY. The Guarantor hereby absolutely and unconditionally guarantees to the [Bank] ... the full and prompt payment ... of ... all sums of principal, interest and other charges due or to become due to the [Bank] from the [Paige Group] pursuant to the Loan Agreement....
 
 
 85
 SECTION 3.--ENFORCEMENT OF GUARANTY. The [Bank] may, in its sole discretion, proceed to exercise any right or remedy which the [Bank] may have under this Guaranty Agreement or by law ... without pursuing or exhausting any right or remedy which the [Bank] may have against the [Paige Group]....
 
 
 86
 SECTION 11.--TRANSFER OF BENEFIT. This Guaranty Agreement shall be binding upon the Guarantor, and his heirs, executor, administrators, and personal or legal representatives, and shall inure to the benefit of, and be enforceable by, the [Bank], its successors, endorsees and assigns.
 
 
 87
 SECTION 15.--GOVERNING LAW. The within Guaranty Agreement is to be executed and delivered within the State of New Jersey, is to be performed within the State of New Jersey, and the Guarantor and the [Bank] elect that the laws of New Jersey shall govern the construction of this Guaranty Agreement and the rights, remedies, warranties, representations, covenants, and provisions hereof.
 
 
 88
 J.App. I 268-69, 275, 277. We are satisfied that the settled rules governing guarantee transactions do not permit the Stablers' guarantee, running to NJNB, to benefit those who were not designated to receive its benefit.
 
 
 89
 While Pennsylvania authority is sparse, we have nevertheless been advised by Vantage and the Stablers that the Pennsylvania law and the New Jersey law concerning guarantee contracts are in accord. This is not disputed by VATCO. Furthermore, we are satisfied that the expressions of common law found in other state cases are consistent with Pennsylvania and New Jersey authorities and correctly identify the controlling principles. We observe as well that Section 15 of the Stabler-NJNB guarantee invokes New Jersey law. It is therefore significant that the highest court in New Jersey, in ruling on a guarantee sought to be invoked by a stranger to the guarantee contract, construed the guarantee strictly and stated:
 
 
 90
 a special guaranty usually contemplates a trust in the person to whom it is addressed, and, as a general rule, no one can accept and act on the proposition of a special guaranty, or acquire any advantage therefrom unless he is expressly referred to, or necessarily embraced in, the description of the persons to whom the offer of guaranty is addressed.... Only the particular individual to whom the offer of guaranty is addressed has the right to act upon and acquire rights under it....
 
 
 91
 Ferguson Carpet Co. et al. v. Schottenfeld, 109 N.J.L. 539, 162 A. 534, 536 (N.J.1932).
 
 
 92
 Accord, Wipfli v. Bever, 37 Wis.2d 324, 155 N.W.2d 71, 73 (1967); Burkhardt v. Bank of America National Trust & Savings Assn., 127 Colo. 251, 256 P.2d 234, 236 (1953); Niederer v. Ferreira, 189 Cal.App.3d 1485, 234 Cal.Rptr. 779, 788 (2 Dist.1987) (only named obligee may enforce special guarantee, which is not transferable). See also Zanditon v. Feinstein, 849 F.2d 692, 699 n. 12 (1st Cir.1988) (interpreting Massachusetts law); Ross v. Imperial Construction Co., Inc., 572 F.2d 518, 520 (5th Cir.1978) (interpreting Alabama law); 41 ALR 2d 1213, 1216. Nor can the liability flowing from a guarantee be extended by implication beyond the guarantee's precise terms and scope. Boorstein v. Miller, 124 N.J.Eq. 526, 3 A.2d 87, 90. (N.J. Ch. 1938) (strictissimi juris).
 
 
 93
 Ferguson Carpet Co. involved a guarantee of an account incurred by one Obolsky. In order to receive carpeting materials, Obolsky had furnished a guarantee from one Schottenfeld that guaranteed payment of Obolsky's obligation. The guarantee ran to Allenson, who was the selling agent for the Ferguson Carpet Company. After Obolsky failed to make payment and filed in bankruptcy, the Ferguson Carpet Company sought to obtain payment from Schottenfeld under Schottenfeld's guarantee to Allenson. The New Jersey Court of Errors and Appeals unanimously ruled that Ferguson could not prevail because:
 
 
 94
 the contract of guaranty was addressed to, and obviously was for ... the benefit of [Allenson], and there was no proof affirmatively showing that it was for the benefit of the Ferguson Carpet Co.
 
 
 95
 162 A. at 536.
 
 
 96
 Subsequent cases in New Jersey express the same principle:
 
 
 97
 An agreement guaranteeing a particular debt or debts does not extend to other indebtedness not within the manifest intention of the parties. In accordance with the rule of strict construction, the guarantor cannot be held liable beyond the strict terms of his contract.
 
 
 98
 Garfield Trust Co. v. Teichmann, 95 A.2d 18, 22, 24 N.J.Super. 519 (N.J.Super.Ct.App.Div.1953) (citations omitted). Indeed, the sole Pennsylvania case addressing the matter we have reviewed is not to the contrary. See Barratt v. Greenfield, 9 A.2d 188, 190-91, 137 Pa.Super. 310 (1930).
 
 
 99
 Thus, VATCO here, where there was no proof that the Stablers' guarantee was intended for VATCO's benefit, is in no different position than was the Ferguson Carpet Company: both were strangers to the respective guarantees--in the one case, the guarantee from Schottenfeld to Allenson and in the present case, the guarantee from the Stablers to NJNB. Moreover, VATCO has not argued, and indeed, in light of the guarantee's terms, could not argue, that it is a "successor, endorsee, or assign" of NJNB or that there is any language present in the Stabler-NJNB guarantee which would confer third-party beneficiary status on VATCO.
 
 B.
 
 100
 Furthermore, NJNB is not a party to this proceeding, and however the evidence may be interpreted, the district court did not find NJNB culpable or hold that NJNB had participated in the fraudulent conveyance of Paige's assets to Vantage. We have no occasion, therefore, to evaluate on this record any purported participation by NJNB in the fraudulent conveyance made by Paige and which would be tantamount to the actions of the East Rutherford Bank deplored in Newman v. First National Bank of East Rutherford, 76 F.2d 347, 350 (3d Cir.1935). There, in recounting the facts of the East Rutherford Bank's activities, we said:
 
 
 101
 Its [the bank's] act of increasing the Holden loan yet holding onto the money and charging interest on it, described as common banking practice in New Jersey (which we are loath to believe), was so far removed from honest banking that it inescapably took on the character of fraud.
 
 
 102
 We thereupon determined that judgment in favor of the East Rutherford Bank was to be voided and other remedies afforded because of the fraud practiced by the bank.
 
 
 103
 Here, as we have noted, however, NJNB, unlike the East Rutherford Bank, was never charged, let alone found, to have conspired with Paige or the Stablers in order to bilk or shortchange other creditors. Hence, Newman provides no authority to support VATCO's argument that we should uphold paragraph 3 of the district court's order, thereby rewriting, in favor of VATCO, guarantees made by the Stablers to NJNB only.
 
 
 104
 Because of our concern that this portion of the district court's order might be without legal basis, and therefore may have been decreed in an improper exercise of the district court's discretion, we questioned counsel closely on this issue at oral argument. Thereafter we sought supplemental memoranda addressed to the propriety of extending a guarantee to VATCO when it was drawn to NJNB. We were not persuaded either at oral argument or by the supplemental memoranda which we received that we could sustain this aspect of the district court's remedial order.
 
 
 105
 At oral argument, the strongest position advanced by VATCO was that the Stablers secreted their own assets by freeing themselves of the guarantees, and that this was part of the intentional fraud found by the district court. In support of that argument, our attention was called to Brown v. Presbyterian Ministers Fund, 484 F.2d 998 (3d Cir.1983). Brown, which deals with the duty of an officer, director and principal stockholder to act with absolute fidelity to both creditors and stockholders, has little relevance, however, to the situation here. In Brown, the Presbyterian Ministers Fund loaned Knight Realty Corporation some $200,000. The loan was secured by a mortgage on property which Knight owned. On default, Presbyterian became a mortgagee in possession and some few months later, Presbyterian agreed to sell the mortgage to Knight's president for less than half of the remaining balance on the mortgage. Knight filed in bankruptcy, and the trustee of the bankrupt corporation, Brown, then learned of the attempt by Knight's president to purchase the mortgage for half its value. We held that Knight's president breached his fiduciary duty by taking advantage of a corporate opportunity and that Brown was entitled as the trustee of the bankrupt estate to institute an action on behalf of that estate to obtain the executory contract to purchase the mortgage at a discounted rate. Nothing discussed in Brown, or revealed by its facts, pertains to guarantees that could inure to the benefit of a stranger to the guarantee.
 
 
 106
 Indeed, although ample opportunity was given to VATCO to furnish us with some basis upon which it could look to the Stabler-NJNB guarantee in payment of its judgment, no such authorities were furnished to us. VATCO did point repeatedly to the standard for review of equitable remedies advanced in Tabor Court Realty, supra. There we held, among other holdings, that an equitable remedy should not be overturned unless there was an abuse of discretion and the "action [ordered] is arbitrary, fanciful, or unreasonable, or ... improper standards, criteria or procedures are used" 803 F.2d at 1306 (quoting Evans v. Buchanan, 555 F.2d 373, 378 (3d Cir.1977)). The standard for reviewing equitable remedies is not at issue here, however. The problem here is that there is simply no legal basis for the district court to have ordered a "rewriting" of the guarantee to run in favor of VATCO, which was not a party to the guarantee at any time.
 
 
 107
 VATCO also discussed at length a corporate officer's duty not to breach fiduciary obligations, but neither that principle, nor any other principle argued by VATCO, bridges the gap which must be closed in order to redirect and rewrite a guarantee in favor of a stranger to that guarantee, such as VATCO is here.
 
 C.
 
 108
 The district court may have misled itself and thereby may have distorted its guarantee holding by commencing its analysis with the proposition that:
 
 
 109
 In bankruptcy, the unsecured creditors would undoubtedly have insisted upon compelling the bank to enforce its guaranty obligations against the Stablers, rather than rely solely upon the Vantage [Paige?] assets.
 
 
 110
 Dist.Ct.Op. at 1325. The district court cited no authority for such a concept, and in the absence of NJNB complicity in the Stablers' transaction, we know of no authority under the circumstances this case presents whereby the unsecured creditors could have compelled NJNB to enforce any guarantee against the Stablers. Indeed, by the very terms of the guarantee, NJNB reserved the right, in its sole discretion, to
 
 
 111
 proceed to exercise any right or remedy which the [Bank] may have under this Guaranty Agreement or by law ... without pursuing or exhausting any right or remedy which the [Bank] may have against the [Paige Group]....
 
 
 112
 J.App. I at 269.
 
 
 113
 In light of the facts found by the district court, and in particular in light of Marvin Stabler's repeated perjury, we can understand only too well why the district court sought to require that every advantage that the Stablers may have received be disgorged for the benefit of the unsecured creditors who were defrauded by the Stablers' actions. Nevertheless, on this record, replete though it is with the Stablers' complicity in the fraudulent acts of Paige, we cannot uphold the district court's attempt to extend the Stablers' guarantee to VATCO when the guarantee ran only to NJNB.
 
 
 114
 We cannot fault the district court for finding that the reduction in the Stablers' guarantee to NJNB was "a part of the consideration-mix" for the transaction as a whole. Dist.Ct.Op. at 30. The record clearly lends support to that finding. But the fact that the Stablers' guarantee to NJNB was scaled down and then ultimately discharged as a result of the August 8, 1986 transaction does not, without more, make the NJNB guarantee a part of the conveyance from Paige to Vantage. This is so even though the Stablers profited thereby. Short of that type of complicity or participation which could involve the guarantee holder in the conduct of the guarantor that defrauded creditors, we find no basis for ordering that the Stablers' guarantees may be used to redress rights of Paige's unsecured creditors to whom the guarantee did not run.
 
 IX.
 
 115
 We will reverse and remand this case to the district court with the direction that it vacate paragraph 3 of its November 14, 1989 Order consistent with the foregoing opinion. In all other respects, and in particular with respect to paragraphs 1 and 2, we will affirm the district court's Order of November 14, 1989.
 
 
 116
 Costs to be taxed against appellants.
 
 
 117
 STAPLETON, Circuit Judge. Concurring in part, dissenting in part.
 
 
 118
 Although the district court's view of the events giving rise to this litigation does not explain to my satisfaction the motivation of the bank in acting contrary to its apparent self-interest, I would affirm as not clearly erroneous the district court's conclusion that Paige transferred its assets for inadequate consideration and with fraudulent intent. I also agree with that portion of this court's opinion which reverses paragraph three of the district court's judgment. I respectfully dissent from section VII of the court's opinion, however, because the remedy ordered by the district court in paragraph two of the judgment, like that contained in paragraph three, leaves the unsecured creditors of Paige in a better position than they would have been in had there been no fraudulent conveyance.[1]
 
 I.
 
 119
 Section 9 of the Uniform Fraudulent Conveyance Act, in force in Pennsylvania by virtue of 39 Pa.Stat. Sec. 359 and, at relevant times,[2] in New Jersey by virtue of N.J.Stat. Sec. 25:2-15, provides that one in VATCO's position is entitled to have the fraudulent "conveyance set aside" or to "disregard the conveyance and attack or levy execution upon the property conveyed." These remedies are designed to place a creditor in the same position it was in prior to the fraudulent conveyance.
 
 
 120
 The remedies provided by the Act are not generally regarded as exclusive and under appropriate circumstances, other relief may be granted. There is, for example, authority supporting the proposition that under Pennsylvania law a damage judgment could properly be entered against the transferee of a fraudulent conveyance if it has dissipated the property conveyed or placed it beyond the reach of the court. In Re Penn. Packing Co., 42 B.R. 502 (Bkrtcy E.D.Pa.1984). Nevertheless, I believe that such alternative remedies can only be "so framed as to place the ... creditor in the same or a similar position he held with respect to the fraudulent transferor prior to the fraudulent conveyance." Id. at 507 n. 5 (quoting Damazo v. Wahby, 305 A.2d 138, 269 Md. 252 (1973)).
 
 
 121
 Accordingly, it is helpful at the outset to consider the position of VATCO and Paige's other unsecured creditors before the fraudulent conveyance and the position they would have been in if Paige had received fair consideration for its assets. To do so, we employ the district court's valuation figures. Prior to the disputed transaction, Paige had assets valued at approximately $1.7 million. Those assets secured $1.5 million worth of loans from the New Jersey National Bank ("NJNB"). In addition, Paige had unsecured creditors with claims totaling approximately $800,000. VATCO's claim represented slightly more than half that amount.
 
 
 122
 If Paige had sold its assets in good faith and for a fair consideration, the first $1.5 million received from such sales would have gone to satisfy NJNB's secured claims. That would have left a maximum of $200,000 from which the unsecured creditors could satisfy their $800,000 worth of claims.[3] Paige's unsecured creditors would not have had access to the additional $150,000 in new funds supplied by the Stablers and Steinberg to capitalize Vantage any more than they would have had access to the Bank's guarantees from the Stablers.
 
 
 123
 While I realize there are suggestions in the district court opinion that Paige's assets may have had a value in excess of $1,700,000, the crucial facts for our purposes are that (1) the district court made no finding that VATCO and the unsecured creditors would have had an amount in excess of that figure to share after the bank's lien was satisfied and (2) the record would not have supported such a finding.
 
 
 124
 In paragraph two of the judgment, the district court imposed a "constructive trust" on the Stablers' interest in the common stock of Vantage in favor of the unsecured creditors of Paige. This was considered appropriate because Vantage purchased Paige's inventory at half price. The constructive trust imposed, however, was not on the Paige inventory, proceeds of the Paige inventory, or any other property traceable to that inventory or those proceeds. The constructive trust thus does not perform the same function here as it ordinarily does in this context--that of undoing or reversing the effects of the fraudulent conveyance.
 
 
 125
 Since Vantage is now in bankruptcy, it is, of course, unlikely that the unsecured creditors of Paige will realize anything from this "constructive trust." In any situation in which that trust would be meaningful to them, however, the value of the Vantage stock would reflect not only the $200,000 of which Paige's unsecured creditors were wrongly deprived, but the additional capital infusion provided during the formation of Vantage and possibly other elements of value in which Paige's unsecured creditors would have no legitimate interest.
 
 
 126
 I do not think that paragraph two of the judgment can be justified, as the court suggests, on a tort or breach of fiduciary duty theory. Whatever the theory, Paige's unsecured creditors can recover from the Stablers only their own damages proximately related to the fraudulent conveyance. Moreover, while it is conceivable that the district court might have been able to render a money judgment against the Stablers that would provide a basis for executing on their interest in Vantage, that is not what the district court did. Nor did the district court find that the Stablers had been unjustly enriched at the expense of the unsecured creditors to the full extent of the value of their interest in Vantage.
 
 
 127
 I would reverse paragraph two of the district court's judgment as well as paragraph three.
 
 
 
 [1]
 In addition to the parties named here, the named defendants in the district court action also included Paige Steel Inc., Paige Industries, Inc., Paige Steel Processing, Inc., and Cypress International Corp.--all related entities found to be owned and controlled by the Stablers
 
 
 [2]
 Damages and interest have grown in the interim from the amount of the original judgment, $452,307.15, to $520,070.06
 
 
 [3]
 Several days earlier, on August 4, 1986, the new entity, Vantage Steel Corporation, was incorporated in Pennsylvania by the Stablers' attorney
 
 
 [4]
 With the exception of a somewhat higher interest rate (applicable index + 3% rather than the same index + 2%) NJNB's loans to Vantage carried terms identical to its loan to Paige
 
 
 [5]
 The district court, Findings of Fact No. 30, 70, found that on August 8, 1986 Paige owned $1 million in inventory, over $500,000 in machinery and equipment, and over $200,000 in accounts receivable
 
 
 [6]
 Finding of Fact No. 10. Prior to August 8, 1986 Paige's debt to NJNB of $1.5 million was personally guaranteed by the Stablers
 
 
 [7]
 In Finding of Fact No. 69 the district court reported that Stabler: "[claimed] that he knew very little about the August 8 transactions, ... had no part in negotiating with Steinberg, and [like his wife] had no ownership interest or participation in Vantage."
 
 
 [8]
 VATCO also alleged that Stabler had violated U.C.C. Article 6--Bulk Transfers, codified as 13 P.C.S.A. Secs. 6101-11. The district court suggested that a violation of bulk transfer requirements may well have taken place (Dist.Ct.Op. at 1323-24), but it held that VATCO's claim under the Bulk Transfer provisions was not timely, as it was barred by the 6-month statute of limitations from the time it had constructive notice of the alleged bulk transfer. That ruling is not appealed here
 
 
 [9]
 The district court's Finding of Fact No. 15 also suggests that Stabler eschewed "the idea of placing the Paige Group into bankruptcy under Chapter 11" in order to avoid NJNB's eventually collecting on its secured debt under the Stablers's guarantee
 
 
 [10]
 In circumstances such as these, lack of good faith is a factual finding; U.S. v. Tabor Court Realty Corp., 803 F.2d 1288, 1299, 1304 (3d Cir.1986); Krasnov v. Dinan, 465 F.2d 1298, 1299-1300 (3d Cir.1972). See Perichak v. Int'l Union of Electrical Radio and Machine Workers, 715 F.2d 78, 79 (3d Cir.1983) (Garth, J.) (district court's finding of "bad faith" may be reversed only if clearly erroneous)
 11 U.S. v. Gleneagles Investment Co., Inc., 565 F.Supp. 556 (M.D.Pa.1983); 571 F.Supp. 935 (M.D.Pa.1983); 584 F.Supp. 671 (M.D.Pa.1984); aff'd sub nom U.S. v. Tabor Court Realty, 803 F.2d 1288 (3d Cir.1986).
 
 
 [12]
 "Simultaneity" and "purpose" are key to evaluating the transactions. Tabor Court Realty, 803 F.2d at 1302
 
 
 [13]
 39 P.S.A. Sec. 353 defines the giving of fair consideration as follows:
 Fair consideration is given for property or obligation: (a) When, in exchange for such property or obligation, as a fair equivalent therefor and in good faith, property is conveyed or an antecedent debt is satisfied; or (b) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.
 
 
 [14]
 At no extra cost Vantage received Paige's "goodwill": the customer lists, offices, staff, and intangibles
 
 
 [15]
 That appraisal was prepared by the auction and appraisal firm of Daley-Hodkin in a letter to NJNB dated June 19, 1986. At that time, Daley-Hodkin put the book value of Paige's inventory at $1,302,000
 
 
 [16]
 The district court also intimated (Dist.Ct.Op. at 1326) that Stabler, as officer, director and sole shareholder of Paige had breached his fiduciary responsibilities to Paige and to its creditors. Finally, the district court hinted (at 1326) that because the Stablers engineered a sham transaction in order to accomplish a fraud, the corporate veil of Paige/Vantage, which they controlled, could be pierced
 
 
 [17]
 This outright control would supersede the Proxy attached to the Holley Sue Stabler loan to Steinberg, which already afforded Holley Sue Stabler unconditional voting and control over 1667 of Steinberg's 2000 shares. J.App. at 214
 
 
 [18]
 As we have observed, supra at 214-15, based on this difference, the district court found both constructive fraud and the absence of "fair consideration" to be beyond dispute
 
 
 [19]
 Indeed, had Paige filed in bankruptcy, as it did not, the stock of Vantage held by Paige would have been deemed an asset of the estate for the benefit of creditors
 
 
 [20]
 Although Steinberg had purported to have $200,000 in cash available, and so represented to NJNB when it finally, after substantial delay, asked him, Steinberg in fact had much less cash available--$50,000 borrowed from his estranged wife
 
 
 [21]
 Holley Stabler's $100,000 loan to Steinberg was secured by over 83% of Vantage's shares (and 1667 of the 2000 Steinberg owned); it was payable on demand; Stabler held an irrevocable carte blanche proxy permitting her to vote all the shares serving as security; Steinberg was bound not to sell or encumber any Vantage assets or declare any dividends; no management changes were to be permitted. J.App. I-214
 
 
 [22]
 Finding of Fact No. 50 explicitly found that:
 Holley Stabler has no interest independent of Marvin Stabler's interest in owning or operating a steel processing business. Holley Stabler would have exercised her proxy if her husband had asked. Holley Stabler was made the beneficiary of the various agreements with Steinberg to conceal Marvin Stabler's interest in Vantage.... The money she lent to [Steinberg] was borrowed by Marvin Stabler and delivered to Steinberg by a check from the Stablers' joint account.
 
 
 [23]
 In the bankruptcy context also, fraudulent conveyances and similar acts will legitimate piercing the corporate veil and reaching the assets of those individuals standing behind the veil insofar as they have derived recognizable proceeds or unjust enrichment from their acts. See, e.g., In Re Vermont Toy Works, 82 B.R. 258 (Bk.Ct.D.Vt.1988) (piercing corporate veil and directing marshalling of assets where the corporate form used as sham for fraudulent conveyance); In Re Overmyer Telecasting Co., Inc., 23 B.R. 823 (Bk.Ct.N.D.Ohio 1982) (same)
 
 
 [24]
 See Finding of Fact No. 67:
 The efforts to conceal the August 8, 1986 transaction and the structure of the transaction itself establish that Stabler intended to hinder and delay collection by, and to defraud, Paige Steel's unsecured creditors, including VATCO.
 
 
 [25]
 Not only does Pennsylvania law provide for liability against corporate officers where the record establishes the officers' participation in the corporation's tortious activity, but it is evident as well that the Stablers breached their fiduciary duty owing to Paige and thus to Paige's creditors when they participated in the fraudulent conveyance of Paige's assets to Vantage for less than full consideration. See generally Pepper v. Litton, 308 U.S. 295, 306-10, 60 S.Ct. 238, 245-47, 84 L.Ed. 281 (1939); Brown v. Presbyterian Ministers Fund, 484 F.2d 998, 1005 (3d Cir.1973); Tate v. Hoover, 345 Pa. 19, 26 A.2d 665 (1942)
 That a breach of fiduciary duty to Paige of the sort committed by the Stablers damages creditors, has been stated clearly by another court, which held that,
 [t]he law is clear that the rights of creditors are involved ... where there has been prejudice to creditors, and prejudice arises where the transaction is a fraudulent conveyance or one which led to corporate insolvency.
 In Re Tufts Electronics, Inc., 746 F.2d 915, 917 (1st Cir.1984).
 The breach of fiduciary duties by the Stablers also took the form of their usurping for themselves a corporate opportunity, the benefits of which the district court redirected to Paige's unsecured creditors by p 2 of its Order.
 
 
 [26]
 Judge Stapleton, in his dissent, does not agree that a constructive trust should be imposed, and hypothesizes that in the absence of the Stablers' fraudulent scheme and actions, the unsecured creditors may not have been able to satisfy more than $200,000 of their claims against Paige. Because a sale of Paige's assets might, after satisfaction of NJNB's secured claim, have left a lesser sum available to the unsecured creditors than they might receive from enforcement of the constructive trust, he argues that our disposition leaves Paige's unsecured creditors in a better position than they would have been absent the fraudulent conveyance. He also argues that the district court did not find that the Stablers had been unjustly enriched, at the expense of the unsecured creditors, to the full extent of the value of their interest in Vantage
 The short answer to these arguments is that the district court made extensive findings of fraudulent acts and intent on the part of the Stablers--findings with which Judge Stapleton himself agrees. Judge Stapleton's hypotheses as to what might have occurred in the absence of the fraudulent conveyance can be no substitute for the well-reasoned and appropriate remedy fashioned by the district court and based on findings that cannot be disturbed. Under that remedy, the Stablers would be obliged to disgorge the benefits they received from the August 8, 1986 fraudulent transaction. Moreover, Judge Stapleton's reliance on the purported failure of the district court to find that the Stablers had been unjustly enriched at the expense of the unsecured creditors is misplaced. The district court explained the basis for its constructive trust remedy, and predicated that remedy on the fact that the Stablers were unjustly enriched:
 To the extent of the consideration they have received in exchange for the Paige assets, they have been unjustly enriched at the expense of plaintiff and the other unsecured creditors of Paige.
 District Court Opinion at 1326.
 Nor is there substantiation for Judge Stapleton's concern that the constructive trust will encompass "elements of value in which Paige's unsecured creditors would have no legitimate interest." The Stablers' interest in Vantage arises entirely from the Stablers' fraudulent transaction, and nothing appears of record to support Judge Stapleton's concern.
 
 
 [27]
 Within six months, Marvin Stabler had collected Paige's outstanding accounts receivable. Thereafter, the Stablers had no further liability to NJNB on their guarantee. Finding of Fact No. 36
 
 
 [1]
 I do not understand the appellants to challenge paragraph one of the judgment other than on the ground that the district court erred in finding inadequate consideration, fraudulent intent, and prejudice to VATCO
 
 
 [2]
 New Jersey adopted the Uniform Fraudulent Transfer Act effective January 1, 1989
 
 
 [3]
 In reality this overstates the amount that would have been available to the unsecured creditors. The hypothetical sale of assets would have created expenses that would have been paid before either the bank's or the unsecured creditors' claims were satisfied. Similarly, if Paige had defaulted and NJNB had disposed of the collateral pursuant to 13 Pa.C.S.A. Sec. 9504, the proceeds first would have been applied to the expenses of the sale